Argued and submitted September 14, 1999; resubmitted en banc January 26, affirmed March 1, 2000

# Mary Shaidaee LADU,
## Personal Representative of the Estate of Baby LaDu, and Mary Shaidaee LaDu,
*Appellants,*

*v.*

# OREGON CLINIC, P.C.,
## Erik P. Eselius and Kelvin Chiu Yu,
*Respondents.*

## (9804-02472; CA A103697)

998 P2d 733

Carl G. Kiss argued the cause for appellant. With him on the briefs was Paulson and Baisch Trial Lawyers.

Kelly A. Giampa argued the cause for respondents Oregon Clinic, P.C. and Erik P. Eselius. Lindsey H. Hughes argued the cause for respondent Kelvin Chiu Yu. With them on the brief, respectively, were Janet M. Schroer and Hoffman, Hart & Wagner, and Keating Jones Bildstein Hughes & Yelnosky, P.C.

Before Deits, Chief Judge, and Edmonds, De Muniz, Landau, Haselton, Armstrong, Linder, Wollheim, Kistler and Brewer, Judges.

HASELTON, J.

De Muniz, J., concurring.

## HASELTON, J.

Plaintiff LaDu, in her capacity as personal representative of the estate of Baby LaDu, appeals the trial court's order and judgment dismissing with prejudice her claim against defendants for the wrongful death of a nonviable 16-week-old fetus. The trial court granted defendants' motion to dismiss plaintiff's claim for failure to state a claim. ORCP 21 A(8). On appeal, plaintiff asserts that the trial court erred in dismissing her claim, arguing that a 16-week-old fetus is a "person" for purposes of Oregon's wrongful death statute. ORS 30.020. For the following reasons, we conclude that the trial court correctly determined that plaintiff failed to state a claim on behalf of the nonviable fetus under the wrongful death statute.

■ In reviewing the dismissal of a complaint for failure to state a claim, we assume the truth of all allegations, as well as any reasonably related inferences, and view them in the light most favorable to the nonmoving party. *Granewich v. Harding*, 329 Or 47, 51, 985 P2d 788 (1999). Plaintiff alleged that, in June 1997, after experiencing pelvic pain, she had a CT scan at the Oregon Clinic that was interpreted by a radiologist, Dr. Eselius. As a result of that CT scan, plaintiff was referred to Dr. Yu and diagnosed with a new onset pelvic mass. Shortly thereafter, plaintiff underwent exploratory surgery with a total abdominal hysterectomy for removal of the presumed tumor. After surgery, plaintiff was told that the mass in her pelvis had not been cancer but had been a 16-week-old fetus. The hysterectomy terminated plaintiff's pregnancy.

Plaintiff initiated this action against Eselius, Yu, and the Oregon Clinic on behalf of herself (medical negligence) and as personal representative of the estate of the fetus (wrongful death). Defendants moved to dismiss plaintiff's claim for the wrongful death of the fetus on the ground that it failed to state a claim. ORCP 21 A(8). The trial court granted defendants' motions and entered a partial judgment pursuant to ORCP 67 B on plaintiff's wrongful death claim. Plaintiff's remaining claim for medical negligence is not at issue in this appeal.

■ ■     The parties' arguments center on whether a 16-week-old fetus may be considered a "person" for purposes of Oregon's wrongful death statute, ORS 30.020(1), which provides:

> "When the death of a person is caused by the wrongful act or omission of another, the personal representative of the decedent, for the benefit of the decedent's surviving spouse, surviving children, surviving parents and other individuals, if any, who under the law of intestate succession of the state of the decedent's domicile would be entitled to inherit the personal property of the decedent, and for the benefit of any stepchild or stepparent whether that stepchild or stepparent would be entitled to inherit the personal property of the decedent or not, may maintain an action against the wrongdoer, if the decedent might have maintained an action, had the decedent lived, against the wrongdoer for an injury done by the same act or omission."

In analyzing a statute, we start with its text, read in context. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-11, 859 P2d 1143 (1993). Generally, we give words of common usage their plain, natural and ordinary meaning. *Id.* We look also to the context of the statutory provision at issue, which includes other provisions of the same statute and other related statutes, *id.* at 611, as well as the statutory framework within which the law was enacted. *Id.; see also Goodyear Tire & Rubber Co. v. Tualatin Tire & Auto*, 322 Or 406, 416-17, 908 P2d 300 (1995), *modified* 325 Or 46, 932 P2d 1141 (1997).

■     Oregon's wrongful death statutory scheme is currently codified at ORS 30.010 through ORS 30.100. It does not contain any definition of the term "person," as used in ORS 30.020(1). The original antecedent of ORS 30.020(1) was enacted in 1862, *see* General Laws of Oregon, ch 4, § 367 (Deady 1845-1864), and included the same operative language, including "person," as the current statutes.[1] The statutory scheme has never defined "person." However, reference

---

[1] The 1862 statute provided:

"When the death of a person is caused by the wrongful act or omission of another, the personal representatives of the former may maintain an action at law therefor against the latter, if the former might have maintained an action, had he lived, against the latter, for an injury caused by the same act or omission. Such action shall be commenced within two years after the death, and the

to contemporaneous dictionary definitions elucidates the common understanding of that term at the time of enactment.

Noah Webster, *The American Dictionary of the English Language* (1828) defined "person" as: "An individual human being consisting of body and soul. We apply the word to living beings only, possessed of a rational nature; the body when dead is not called a person. It is applied alike to a man, woman or *child*."[2] (Emphasis added.) The same source, in turn, defined "child" as: "A son or daughter; a male or female descendant, in the first degree; the immediate progeny of parents; applied to the human race, and chiefly to a person when young. *The term is applied to infants from their birth;* but the time when they cease ordinarily to be so called, is not defined by custom." *Id.* (emphasis added). Thus, at the time of the wrongful death statute's enactment, the common understanding of "person" and "child" did not encompass nonviable fetuses.

Reference to statutory context generally confirms that understanding. ORS 30.020(2) describes the types of damages that may be recovered in wrongful death actions, including medical services, burial services, amounts that would compensate the decedent "for disability, pain, suffering and loss of income during the period between injury to the decedent and the decedent's death," loss to the decedent's estate, as well as amounts to compensate "the decedent's spouse, children, stepchildren, stepparents and parents for pecuniary loss and for loss of the society, companionship and services of the decedent," as well as punitive damages. ORS 30.020(2).

ORS 30.030 concerns how such damages will be distributed: Under that statute, the personal representative of the decedent first pays the fees incurred in the prosecution of the wrongful death claim, then pays medical and burial

---

damages therein shall not exceed five thousand dollars, and the amount recovered, if any, shall be administered as other personal property of the deceased person."

[2] The current definition of "person" includes "an individual human being," or "a human being as distinguished from an animal or thing ‹only ‑s can inherit under a will›." *Webster's Third New Int'l Dictionary*, 1686 (unabridged ed 1993).

expenses. Then, if a portion of the damages was to compensate "the decedent's spouse, children, stepchildren, stepparents and parents for pecuniary loss and for loss of the society, companionship and services of the decedent," as described in ORS 30.020(2)(d), the personal representative distributes that portion to the appropriate beneficiary. Finally, "[t]he remainder of damages accepted or recovered shall be distributed to the beneficiaries in the proportions prescribed under the laws of intestate succession of the state of decedent's domicile[.]" ORS 30.030(5).

From ORS 30.030, therefore, we learn that distribution of wrongful death damages may be made, in part, based on the laws of intestate succession. The laws of intestate succession, however, are silent as to the distribution of the estate of a stillborn fetus and do not describe a hierarchy of intestate succession for the estate of a stillborn fetus. The only relevant statute within the probate code that pertains to intestacy and the unborn is ORS 112.075, which provides that "persons conceived before the death of the decedent *and born alive* thereafter [will] inherit as though they were alive at the time of the death of the decedent."[3] Thus, although the probate code is silent as to the distribution of the estate of a stillborn fetus, it clearly indicates that a stillborn fetus is incapable of *inheriting* by intestate succession. There is, thus, no support to be found in the probate code for the proposition that a stillborn fetus is a "person" for purposes of the laws of inheritance.

---

[3] This would appear to comport with the common law concerning the property rights of the unborn. William Blackstone, 1 *Commentaries on the Laws of England*, 129 (Christian ed 1807), indicates:

"An infant *in ventre sa mere*, or in the mother's womb, is supposed in law to be born for many purposes. It is capable of having a legacy, or a surrender of a copyhold estate made to it. It may have a guardian assigned to it; and it is enabled to have an estate limited to its use, and to take afterwards by such limitation, as if it were then actually born."

Some annotated editions of the *Commentaries* go on to note: "But as it respects the rights of others claiming through the child, if it is born dead, or in such an early stage of pregnancy as to be incapable of living, it is to be considered as if it never had been born or conceived. 2 Parjes C. R. 35." Blackstone, 1 *Commentaries*, 94 n 13 (Chitty ed 1870). *See also Roe v. Wade*, 410 US 113, 162, 93 S Ct 705, 35 L Ed 2d 147 (1973) ("[U]nborn children have been recognized as acquiring rights or interests by way of inheritance or other devolution of property, and have been represented by guardians *ad litem*. Perfection of the interests involved, again, has generally been contingent upon live birth.") (footnote omitted).

The only other even arguable contextual statutory reference is an 1853 anti-abortion statute, which provided that administration of a drug to, or use of an instrument on, "any woman pregnant with a quick child" with the intent "to destroy such child, unless the same shall have been necessary to preserve the life of such mother," that resulted in the death of either the mother or the child, constituted manslaughter. Statutes of Oregon, ch 3, § 13, p 187 (1854). That territorial criminal statute was still in effect when the legislature enacted the Civil Wrongful Death statute in 1862. *See* Or Const, Art XVIII, § 7. That statute has little, if any, contextual relevance. It involved criminal, not civil, liability. Moreover, its reference to "quick child" appears to have been *sui generis* to the criminal anti-abortion context.[4]

In sum, nothing in the statutory context indicates that a nonviable fetus is to be considered a "person" for purposes of the wrongful death statutes. Rather, the plain statutory text and context admit to only one reasonable reading: "Person" within the meaning of ORS 30.020(1) does not include nonviable fetuses.

■ That conclusion would be uncomplicated but for *Libbee v. Permanente Clinic*, 268 Or 258, 518 P2d 636 (1974), and the "rule of prior construction." *See Stephens v. Bohlman*, 314 Or 344, 350 n 6, 838 P2d 600 (1992) ("When this court interprets a statute, that interpretation becomes a part of the statute as if written into it at the time of its enactment."). Plaintiff argues that, by virtue of *Libbee*, "the word 'person' in Oregon's Wrongful Death Act necessarily includes a viable fetus" and that, as a matter of remedial fundamental fairness, the statute should be construed to afford equivalent relief for the death of a nonviable fetus:

> *"The absurdity of allowing a wrongful death claim for a fetus killed one second after achieving viability, and barring a wrongful death claim for a fetus killed one second before achieving viability, will also guide this Court to a just result,*

---

[1] Plaintiff also characterizes as "context" an 1864 criminal anti-abortion statute, which employed the phrase "any woman pregnant with a child." *See* General Laws of Oregon, ch 43, § 509 (Deady 1845-1864). That after-enacted statute cannot be treated as context in discerning the meaning of "person" in the 1862 antecedent of ORS 30.020(1). *See Stull v. Hoke*, 326 Or 72, 79-80, 948 P2d 722 (1997).

*as a comparable potential absurdity guided the Oregon Supreme Court to a just result in Libbee. After all, why should a wrongful death claim not lie against a tortfeasor for the death of a nonviable fetus, when the fetus failed to reach viability only because of the tortfeasor's wrongful conduct?*"[5] (Emphasis in original; citation omitted.)

We disagree.

In *Libbee*, the court addressed the question of whether a *viable* fetus that was stillborn due to medical negligence had a cause of action under the Oregon wrongful death statutes.[6] In *Libbee*, the pregnant mother went into labor and was admitted into the defendant hospital some six weeks after her expected due date. 268 Or at 259-60. Her labor was difficult, and nurses checked her approximately every half hour. After the mother felt an unusual pain, she rang for a nurse, who stopped in and said she would be back later. When the nurse returned some half an hour later, she was unable to detect any fetal heart tones. *Id.* at 260. At trial, the mother presented testimony that the fetal heart tones should have been monitored every five minutes under such circumstances. *Id.* The trial court directed a verdict in the defendant's favor. *Id.* at 259.

On appeal, the Supreme Court reversed and concluded that ORS 30.020 afforded a cause of action for the death of a viable fetus. In so holding, the court did not refer to the now-familiar (but then not-yet-articulated) *PGE* statutory construction methodology. The *Libbee* opinion did not quote the text of ORS 30.020, examine sources pertaining to the contemporary meaning of "person," or refer to any other provision of the wrongful death statutes as context for the meaning of "person." Rather, the analysis rested on more generalized policy-related concerns and authority from other jurisdictions.

---

[5] Plaintiff also argues that different treatment of viable and nonviable fetuses would violate Article I, section 10, and Article I, section 20, of the Oregon Constitution. Because plaintiff did not raise and preserve those constitutional contentions in the trial court, we will not consider them.

[6] A "viable" fetus was defined by the court as "one which has developed in its mother's womb to the point that it is capable of independent existence outside its mother's womb." *Libbee*, 268 Or at 261 n 4.

The court began by noting that it had previously recognized that a child injured *in utero* after the point of viability but born alive was entitled to a remedy, under Article I, section 10, of the Oregon Constitution, for injuries incurred in the mother's womb. *Id.* at 261 (citing *Mallison v. Pomeroy*, 205 Or 690, 697, 291 P2d 255 (1955)). The court went on to note that 19 other jurisdictions permitted wrongful death actions for the death of viable unborn fetuses, although 12 jurisdictions prohibited such actions. *Libbee*, 268 Or at 262. Looking to the three primary reasons that the 12 jurisdictions prohibited such actions, the court rejected each in turn: (1) that precedent did not favor recovery—the court noted that the "weight of authority now favors recovery"; (2) that an unborn child had no separate existence from its mother—the court rejected that proposition as "unscientific"; and (3) that proof of causation would be difficult—the court rejected that argument on the ground that difficulties in proof should not overcome substantive rights. *Id.* at 263-64.

Finally, the court turned to constitutional considerations, such as were at issue in its decision in *Mallison*, and in the United States Supreme Court's then-recent decision in *Roe v. Wade*, 410 US 113, 93 S Ct 705, 35 L Ed 2d 147 (1973). *Libbee,* 268 Or at 266-67. Concerning Article I, section 10, of the Oregon Constitution, the court indicated a belief that a holding that the wrongful death statute did not cover the injury at issue would be irreconcilable with *Mallison*'s holding that the remedies clause required a remedy for *in utero* injuries to a viable fetus. *Id.* at 266. The court acknowledged the holding from *Roe v. Wade* that women have constitutional rights to abort nonviable fetuses, but went on to note:

> "The Court recognized, however, (at 410 US 163-64), that after a fetus has become 'viable' a state may prohibit abortions altogether, except those necessary to preserve the life or health of the mother and (at 410 US 163) that 'State regulation protective of fetal life after viability * * * has both logical and biological justifications.' It follows that the decision in *Roe* is entirely consistent with our previous decision in *Mallison* to the effect that a viable child is a 'person' entitled to the protection of Article I, section 10, of the Constitution of Oregon." *Libbee*, 268 Or at 267 (ellipsis in *Libbee*).

The court thus concluded that the trial court erred in directing a verdict in defendant's favor. *Id.* at 267. In so holding, the court emphasized that its analysis and holding pertained solely to *viable* fetuses:

"It has been predicted that 'the requirement of viability will be scrapped,' but that question need not be decided in this case, which involved a clearly 'viable' child." 268 Or at 263 (quoting Speiser, *Recovery for Wrongful Death*, 361, § 4.33 (1966)) (footnote omitted).

The question thus reduces to whether we should accept plaintiff's invitation to extend *Libbee* beyond its explicit contours and hold that ORS 30.020(1) confers a right of action for the wrongful death of a nonviable fetus. We decline to do so.

Under *PGE*'s "text-in-context" methodology, "person" in ORS 30.020(1) does not encompass nonviable fetuses. Nothing in the rule of prior construction compels a contrary result. Regardless of whether the result in *Libbee* itself might have been different if decided in accordance with *PGE*'s methodology, nothing in *Libbee* purported to address the applicability of ORS 30.020 to an action for the death of a nonviable fetus or to resolve issues of statutory construction bearing on that issue. Indeed, *Libbee* expressly avoided that question.

We are thus faced with the choice: We can take *Libbee* at face value, limiting it to its terms, and reach a result that is consonant with *PGE*. Or we can ignore *Libbee*'s express disclaimer and expand its holding so as to construe the statute in a fashion that cannot be reconciled with *PGE*. The answer is clear.

Affirmed.

**DE MUNIZ, J.,** concurring.

I agree with the majority that the trial court correctly determined that plaintiff failed to state a claim under the wrongful death statute for the death of the 16-week-old fetus. However, I write separately because I believe that the majority has failed to address adequately the Oregon Supreme Court's interpretation of the wrongful death statute

in *Libbee v. Permanente Clinic*, 268 Or 258, 518 P2d 636 (1974), the only case in which it has considered whether or when a fetus has a cause of action under the wrongful death statute.

The majority is correct that nothing in the text of the wrongful death statute or in its statutory context lends support to the notion that a fetus is a "person" for purposes of ORS 30.020. 165 Or App at 693. To that extent, the majority correctly concludes that the statute is not ambiguous. However, under the rule of prior construction, we must treat the court's decision in *Libbee* as part of the text and context of ORS 30.020, and treat it as "a part of the statute as if written into it at the time of its enactment." *Stephens v. Bohlman*, 314 Or 344, 350 n 6, 838 P2d 600 (1992). Despite what the statutory text and context might otherwise suggest, the court in *Libbee* determined that a fetus, albeit a much older fetus than the one in the present case, *was* a "person" for purposes of the wrongful death statute. Given that holding in *Libbee*, the majority errs in holding that ORS 30.020 is unambiguous regarding whether a 16-week-old fetus is a "person."

Because of that ambiguity, the majority errs in thinking that this case may be resolved at the "first level" of the statutory construction framework set forth in *PGE v. Bureau of Labor and Industries*, 317 Or 610, 859 P2d 1143 (1993). That brings us to an interesting point: How are we to apply the *PGE* framework here, given that the requirements for statutory construction set forth in *PGE* are entirely at odds with the approach to statutory construction used by the court in *Libbee*?[1] Keeping in mind the inherent difficulties of imposing the current structure of statutory construction on a foundation that was not designed to support such weight, I will attempt to blend the two distinct approaches to the question.

As the majority correctly concludes, under the *PGE* analysis of the text and context of the wrongful death statute, there is little indication that the term "person" encompassed a fetus. However, in light of *Libbee*, I know that the term

---

[1] The *Libbee* court did not even quote the text of the statute it was supposedly interpreting, much less make any attempt to construe the word "person" as used in the statute.

"person" as used in that statute does encompass "viable fetus." Without any discussion whatsoever of why a viable fetus and a nonviable fetus should be treated differently under the law, the majority leaps to the conclusion that a viable fetus is a "person" for purposes of ORS 30.020 but that a nonviable fetus is not a person for purposes of that statute. In light of the text and context of the wrongful death statute, which includes the Oregon Supreme Court's prior interpretation of that statute in *Libbee*, the statute is ambiguous as to whether the term "person" encompasses a nonviable 16-week-old fetus for purposes of a *PGE* analysis.

Accordingly, the next step should be to discern whether legislative history reveals the intent of the legislature. *See PGE*, 317 Or at 611-12 (if legislature's intent is not clear from text and context, then court considers legislative history). The parties acknowledge, and I agree, that no pertinent legislative history as to the meaning of the term "person" used in the wrongful death statute is available. None exists from the original passage of the statute, and, although the statute has been amended a number of times since its passage, none of the amendments changed the use of the word "person" in any discernible manner.

Where the legislative intent cannot be discerned from text, context and legislative history, the court turns to general maxims of statutory construction to determine the meaning of a statutory term. *Id.* at 612. It is at this level of the statutory construction analysis that one of the court's considerations in *Libbee* comes into play. The relevant maxim is set forth in *State v. Kitzman*, 323 Or 589, 602, 920 P2d 134 (1996):

> "When, after consideration of the text, context, and legislative history of a statute, the intent of the legislature remains unclear, then the court resorts to general maxims of statutory construction to resolve the uncertainty. *PGE*, 317 Or at 612, 859 P2d 1143. Here, the applicable maxim is that, when one plausible construction of a statute is constitutional and another plausible construction of a statute is unconstitutional, courts will assume that the legislature intended the constitutional meaning. Statutes therefore will be construed accordingly."

As the court implicitly acknowledged in *Libbee*, the United States Supreme Court's holding in *Roe v. Wade* constrains the state's ability to protect the life of a nonviable fetus. Moreover, *Roe* specifically recognizes the constitutional right of a pregnant woman to choose to terminate a pregnancy by aborting a nonviable fetus. A holding that Oregon's wrongful death statute permits the personal representative of a nonviable fetus to bring suit for the death of the fetus would put that statute directly into conflict with a pregnant woman's constitutional right to bring about the death of such a nonviable fetus. Although a holding that the wrongful death statute permits the personal representative of a nonviable fetus to bring suit for the death of the fetus might not necessarily create a statute that was facially unconstitutional, it would create a statute that would be unconstitutional as applied in a number of situations where the death of the nonviable fetus is the result of an elective abortion. Consequently, I would choose the statutory construction that avoids this obvious constitutional problem, which clearly was a major consideration of the *Libbee* court when it chose to draw a distinction between viable and nonviable fetuses in reaching its conclusion that the full-term fetus at issue in that case had a cause of action. Therefore, I conclude that the trial court correctly determined that ORS 30.020 does not provide a cause of action for the wrongful death of a nonviable 16-week-old fetus.

Edmonds, Wollheim, and Brewer, JJ., join in this concurrence.